IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHRISTOPHER STEPHEN MARTIN, | § | |
| | § | |
| Movant, | § | |
| | § | |
| V. | § | No. 3:17-cv-2158-M-BN |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Respondent. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Movant Christopher Stephen Martin, a federal prisoner, filed, through counsel, an amended 28 U.S.C. § 2255 motion to vacate, set aside, or correct sentence asserting that his trial counsel was constitutionally ineffective as to his advising him during the guilty plea process. *See* Dkt. No. 16 & 17. This resulting action has been referred to the undersigned United States magistrate judge for pretrial management under 28 U.S.C. § 636(b) and a standing order of reference from Chief Judge Barbara M. G. Lynn. With the benefit of the evidentiary hearing held on June 3, 2019, *see* Dkt. Nos. 48, 50 (hearing transcript), & 51 (agreed admitted hearing exhibits), the undersigned enters these findings of fact, conclusions of law, and recommendation that the Court should deny the amended Section 2255 motion.

**Applicable Background**

Martin ultimately pled guilty under a written plea agreement to – and the Court adjudged him guilty of – being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and he was sentenced to 96 months of imprisonment. *See United*

*States v. Martin*, No. 3:14-cr-183-M (01) (N.D. Tex.).

He appealed, arguing "that his guilty plea should be vacated because the district court impermissibly participated in plea negotiations in violation of Federal Rule of Criminal Procedure 11(c)(1)." *United States v. Martin*, 651 F. App'x 265, 265 (5th Cir. 2016) (per curiam). The United States Court of Appeals for the Fifth Circuit affirmed, holding that, "even if" a "single comment" by the district court "constituted improper participation in plea negotiations in violation of Rule 11(c)(1), the error was harmless." *Id.* at 267.

The comment at issue was made "after Martin lamented that he had rejected a prior plea offer based on his misapprehension that negative gunshot residue (GSR) test results existed that were favorable to his case. Because Martin did not have the benefit of knowing that favorable GSR test results did not exist when he previously rejected the Government's plea offer, the district court merely opened the door for plea negotiations to occur." *Id.*

Thus, the sole claim under Section 2255 now before the Court – that Martin's appointed counsel, Phillip C. Umphres, violated his Sixth Amendment right to effective assistance of counsel during the plea process as related to the existence of GSR test results – was previewed in the Fifth Circuit's decision. *See also id.* ("The record shows that Martin pleaded guilty first and foremost after learning that certain favorable evidence – negative GSR tests – never existed. Immediately after learning that favorable GSR test results did not exist, and the district court informing Martin that it could not order the tests to be performed, Martin sought to, and in fact did, engage

in plea discussions. Moreover, it was the absence of favorable GSR test results, Martin's mistaken belief about the existence of this evidence, and his perception that his counsel was ineffective in advising him about same, that formed the basis for his motion to withdraw his plea. While, in his subsequent motion to reconsider the denial of his motion to withdraw his guilty plea, he averred that he felt pressured by the district court to enter into a plea, he points to nothing in the record to buttress this self-serving statement.").

> Martin argues that the Fifth Circuit's decision establishes the law of the case on the following:
> - Martin lamented that he had rejected a prior plea offer based on his misapprehension that negative gunshot residue (GSR) test results existed that were favorable to his case.
> - The record shows that Martin pleaded guilty first and foremost after learning that certain favorable evidence – negative GSR tests – never existed.

Dkt. No. 28 at 1 (citation omitted).

"The law-of-the-case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case." *Woodfox v. Cain*, 772 F.3d 358, 370 (5th Cir. 2014) (quoting *Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011)). Thus, under this doctrine, a district court "may not consider an issue disposed of in [a movant's] previous appeal at the § 2255 stage," *United States v. Goudea*, 512 F. App'x 390, 393 (5th Cir. 2013) (per curiam) (citing *United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986); *United States v. Rocha*, 109 F.3d 225, 229 (5th Cir. 1997)); *see, e.g., Harris v. United States*,

-3-

366 F.3d 593, 595 (7th Cir. 2004) (finding the ruling on defendant's ineffective-assistance claim on direct appeal binding in a § 2255 proceeding). And, "[i]n order for the law-of-the-case doctrine to apply, the issue 'need not have been explicitly decided; the doctrine also applies to those issues decided by "necessary implication."'" *Goudea*, 512 F. App'x at 393 (citations omitted).

The Fifth Circuit on direct appeal did not find that Umphres denied Martin constitutionally-effective assistance of counsel. Nor did its decision necessarily imply such a finding. Instead, the decision states that it was Martin's "perception that his counsel was ineffective in advising him about [pleading guilty]." *Martin*, 651 F. App'x at 267. Even so, the facts that Martin believes are already the law of the case seem to support the prejudice element of the appropriate standard, as discussed below. But, as also discussed below, the Court need not reach prejudice because Martin has not shown that Umphres's performance was constitutionally deficient.

**Legal Standards**

Relief under Section 2255 is limited to a claim "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). And a movant "has a burden of sustaining his contentions on a § 2255 motion by a preponderance of the evidence," *United States v. Bondurant*, 689 F.2d 1246, 1251 (5th Cir. 1982) (citing *Wright v. United States*, 624 F.2d 557, 558 (5th Cir. 1980)) – that is, "evidence by fifty-one percent, or to the extent of more likely than not," *United*

*States v. Diaz*, 344 F. App'x 36, 43 (5th Cir. 2009) (per curiam) (citation, brackets, and internal quotation marks omitted); *see also Coon v. United States*, 441 F.2d 279, 280 (5th Cir. 1971) ("A movant in a collateral attack upon a judgment has the burden to allege and prove facts which would entitle him to relief."); *United States v. Ellis*, Crim. No. 13-286, 2018 WL 1005886, at *2 (E.D. La. Feb. 21, 2018) ("Ultimately, the petitioner bears the burden of establishing his claims of error by a preponderance of the evidence." (citing *Wright*, 624 F.2d at 558)).

The Court reviews claims of ineffective assistance of counsel under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984), under which a movant must demonstrate that the performance of his attorney fell below an objective standard of reasonableness, *see id.* at 687-88. To be cognizable under *Strickland*, counsel's error must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687; *see also Buck v. Davis*, 580 U.S. ___, 137 S. Ct. 759, 775 (2017) (reaffirming that "[i]t is only when the lawyer's errors were 'so serious that counsel was not functioning as the "counsel" guaranteed ... by the Sixth Amendment' that *Strickland*'s first prong is satisfied" (citation omitted)).

The movant also must prove that he was prejudiced by his attorney's substandard performance. *See Strickland*, 466 U.S. at 687, 692. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

[B]ecause of the risk that hindsight bias will cloud a court's review of

> counsel's trial strategy, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."

*Feldman v. Thaler*, 695 F.3d 372, 378 (5th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689).

"A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003). Moreover, "[j]ust as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Harrington v. Richter*, 562 U.S. 86, 110 (2011).

To demonstrate prejudice, a movant generally "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Richter*, 562 U.S. at 111. "Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different," which "does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-

probable-than-not standard is slight and matters 'only in the rarest case.'" *Id.* at 111-12 (quoting *Strickland*, 466 U.S. at 693, 696, 697). "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

> It is well established that a criminal defendant's right to effective assistance of counsel under the Sixth Amendment extends not just to trial or sentencing but to "the negotiation of a plea bargain," as it "is a critical phase of litigation for the purposes of the Sixth Amendment right to effective assistance of counsel." *Padilla v. Kentucky*, 559 U.S. 356, 373 (2010). As such, "[w]hen considering whether to plead guilty or proceed to trial, a defendant should be aware of the relevant circumstances and the likely consequences of his decision so that he can make an intelligent choice." *United States v. Rivas-Lopez*, 678 F.3d 353, 356-57 (5th Cir. 2012).

*United States v. Scribner*, 832 F.3d 252, 257-58 (5th Cir. 2016) (per curiam); *see also Missouri v. Frye*, 566 U.S. 134, 143-44 (2012) ("Because ours 'is for the most part a system of pleas, not a system of trials,' it is insufficient simply to point to the guarantee of a fair trial as a backstop that inoculates any errors in the pretrial process." (quoting *Lafler v. Cooper*, 566 U.S. 156, 169-70 (2012))).

*Strickland*'s "two-part standard [applies] to ineffective-assistance claims arising out of the plea process." *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). Objective reasonableness remains the standard by which a court should measure counsel's performance, but showing prejudice in this context turns "on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Id.* at 58-59.

And, to establish prejudice where a plea deal is rejected, a movant must show that

> but for the ineffective advice of counsel there is a reasonable probability [1] that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), [2] that the court would have accepted its terms, and [3] that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler*, 566 U.S. at 164.

## Analysis

Martin, at the time already a convicted felon, and Ricardo Gonzalez were arrested by authorities in Greenville, Texas on January 2, 2014, after they were observed discharging firearms, and Martin admitted that he possessed three firearms – and discharged at least one of them – on that day. *See* No. 3:14-cr-183-M, Dkt. No. 61 (factual resume); *see also id.*, Dkt. No. 25-2 (state search warrant, attached to motion to suppress same). Related to the discharge of firearms, authorities performed a GSR test on Gonzalez that day. And Martin was initially charged with unlawful possession of firearms in Hunt County, charges that remained pending after Martin was indicted federally on May 6, 2014. *See id.*, Dkt. Nos. 1 & 4.

The Federal Public Defender for this district initially represented Martin in the underlying federal criminal case, *see id.*, Dkt. No. 6, and, after Umphres was appointed as his counsel on June 25, 2014, *see id.*, Dkt. Nos. 16 & 17, Umphres testified that Martin quickly brought up the GSR test, *see* Dkt. No. 25 at 3-4 (Umphres Aff.), ¶¶ 3 & 5 ("During either the first or second meeting I had with Mr. Martin[ – which meetings, according to Umphres's time records, occurred on June 25, 2014 and July 17, 2014 – ]he also told me that at the time of the arrest the police had done a gunshot

residue test on the other guy who was in the house at the time of the incident, on January 2, 2014, named Ricardo Gonzalez, and that it had tested negative for gunshot residue. He also told me that they had refused him the chance to take a gunshot residue test.").

Martin asserts that it was Umphres who told him that Gonzalez's GSR test result was negative. *See, e.g.,* Dkt. No. 50 at 13:7-16:3 & 62:1-11; No. 3:14-cr-183-M, Dkt. No. 90 at 10:9-15 ("[Martin]: How – I'm just going to ask a question. I've been locked up since January 14th, and I don't talk to the police. How would I know that the test was negative, other than hearing it from my lawyer? Like that's what my whole basis was that the test was negative. Like I denied a plea bargain thinking that this test was negative."). And Martin testified that this occurred in August 2014:

> Q. Now, you've testified that Mr. Umphres told you that the GSR test done on Mr. Gonzalez was negligent, right?
> A. Mr. Umphres told me that, yes, ma'am.
> Q. And do you remember when approximately he told you that?
> A. I was in Dallas County probably – probably in August, maybe – probably August. Because it was pretty close into the case – like the second batch of discovery, when he showed me the discs and we went over the discs of Andrea and all that, that's when he told me there's no fingerprints and the gunshot residue was negative.

Dkt. No. 50 at 34:4-13; *see also* No. 25 at 3, ¶ 3 (Umphres's time records reflected meetings with Martin on August 22, 2014 and August 29, 2014).

But the recording of a July 16, 2014 jail call between Martin and Ricardo's brother, Salvas Gonzalez, reflects that Martin was discussing the results of the GSR test – results that he already thought were in his favor – prior to an August 2014 meeting with Umphres. *See* Gov't Ex. 44; Dkt. No. 50 at 34:14-40:4; *see, e.g.,* Dkt. No.

50 at 38:5-8 ("[Martin:] You know, thank the Lord that, you know what I'm saying when Rich took that – he took a pow – what – a GSR, gunpowder residue, that proved I wasn't shooting nothing because it came back inclusive.").

And Umphres testified that

> [b]y July 16, 2014 I had received the initial batch of discovery from the government and over the next several weeks I reviewed it. I noted that there was no GSR test result in the discovery and so on August 22, 2014 I wrote a letter to the lead AUSA, Phelesa Guy, asking for multiple specific items of discovery, including the test results from the GSR test. I sent Mr. Martin a copy of this letter (via: bcc) through US Mail. In the letter, I stated on the very first page:
>> 3. I understand that a test for gunshot residue was performed on Ricardo Gonzales [sic] on or about January 2, 2014. However, I have not been given the test results and I would request them as I believe the results are exculpatory to my client as well as to Mr. Gonzalez.
>
> Thus, no later than his receipt of this August 22 letter, Mr. Martin was fully aware that I did not have any test results related to the GSR test on Mr. Gonzalez.
>
> I did not receive a response from AUSA Guy to my August 22 request and so I followed up with a second discovery request by letter dated September 24, 2014 that requested broadly any and all results of any tests or examinations relevant to the pending charges.

Dkt. No. 25 at 8-9, ¶¶ 12 & 13 (emphasis omitted); *see also* Gov't Exs. 7 & 24.

After hearing live testimony from Martin and Umphres, and considering the totality of the record before the Court, the undersigned finds credible Umphres's account of who told whom that the GSR test result was negative.

While Umphres attempted to obtain an actual test result, he operated under the assumption that what Martin represented regarding that result was accurate, *see* Dkt. No. 25 at 4-5, ¶¶ 6 & 7, including when, on September 24, 2014, Umphres filed on Martin's behalf an ultimately unsuccessful motion to suppress the search warrant, the

-10-

reply to which, filed on October 9, 2014, referenced a negative GSR test:

> During the course of the interview, at 12:23 pm Mr. [Gonzalez] voluntarily submitted to a gunshot residue test. The test came back negative, thus indicating that contrary to what Terry Bishop (the anonymous source described in the search warrant affidavit) had said, the he had not in fact been firing a weapon that morning.
> While the test swabs were sent off to a laboratory for definitive analysis, counsel is advised that at least some gun shot residue test kits provide a presumptive "field result." The result in this case would have been negative. If such an analysis was done here, this extremely important fact was omitted from the search warrant affidavit, in spite of the fact that it was known to the officers before the search warrant affidavit was presented to the magistrate.

No. 3:14-cr-183-M, Dkt. No. 42 at 3.

And, during this time, on October 6, 2014, the government offered Martin the 72-month plea deal with an expiration date of October 9, *see* Gov't Exs. 1 & 5, an offer that, as Martin confirmed, was presented to him and which he discussed with Umphres several times, *see* Dkt. No. 50 at 51:12-13 & 55:22-56:21, before he rejected it, *see* Gov't Ex. 2; *see also* Dkt. No. 25 at 9-10, ¶¶ 15 & 16 (Umphres testifying that, "[d]uring our discussions on October 6, 8 and 9 Mr. Martin and I thoroughly reviewed the evidence relevant to his case so that he could make an informed decision about whether to plead guilty or not. There is absolutely no question in my mind that the issue of the GSR test results came up during these discussions. During these discussions I told him that I still did not have any written GSR test report from the government. Nevertheless, despite my advice that the motions to suppress were losers and that the evidence of guilt or innocence was against him, he insisted on going to trial.").

Martin insisted that, during these discussions, Umphres told him that the GSR test result was negative and to "go to trial." See Dkt. No. 50 at 56:22-57:19; *see, e.g., id.* at 57:16-19 ("He told me -- before I denied this plea bargain, ma'am, I asked him specifically, 'Are you sure the gun powder residue test is negative,' and he told me the test is negative, go to trial.").

But this statement is not only inconsistent with Umphres's testimony, its certitude is also inconsistent with Umphres's then-contemporaneous effort to obtain a test result from the government and at least one jail call recording, between Martin and his father shortly after the deal was presented. *See* Gov't Exs. 62; *see, e.g.,* Dkt. No. 50 at 63:15-20 (Martin answering his father's question, "what did [Umphres] suggests": "See, lawyers are safe. Lawyers are very safe. And his legal advice is, you know – I mean, he even told me, he was like, look, I'm not – I mean, you got a shot, but (unintelligible)."); *id.* at 71:16-23 ("[Martin]: Well, no. I mean, my attorney, he – I don't know. I mean, I've got a good attorney. I've been blessed to get a good attorney, but he was an attorney – attorneys always play it safe. Sometimes safe is not the – the – sometimes if you – you just got – you know, my (unintelligible) trial before – because – before I see the discovery because I don't give a damn what's in discovery, I know I didn't do it. So I don't give a damn, you know.").

The government, of course, confirmed on October 14, 2014 – in response to Umphres's requests but after expiration of the 72-month plea deal – that there was no presumptive test for GSR and that the kit was never submitted to a lab for official results.

An examination of all evidence before the Court, including testimony from an evidentiary hearing that lasted more than five hours – which allowed the undersigned to determine that Umphres is credible, while Martin is generally not, for at least the reasons explained above – leads to a finding that Umphres did not render constitutionally-deficient performance under *Strickland*.

Umphres's taking Martin's initial representation regarding the GSR test result at face value may or may not been a miscalculation. But, given the record here, which reflects that early in his representation of Martin – and more than once – Umphres attempted to validate Martin's representation by requesting the test results from the government, Umphres's reliance on Martin was at worst a "reasonable miscalculation" that – particularly given hindsight bias – he should "not be faulted for." *Richter*, 562 U.S. at 110; *see also Feldman*, 695 F.3d at 378.

And, having found that Umphres performed objectively reasonable, the Court need not consider *Strickland*'s prejudice prong as applied to a defendant's rejection of a plea deal, in *Lafler*.

Thus, on this record, the Court should find that Umphres did not deny Martin constitutionally-effective assistance of counsel during the plea process, specifically as related to Martin's consideration (and rejection) of the government's October 6 plea offer.

**Recommendation**

The Court should deny Movant Christopher Stephen Martin's amended 28 U.S.C. § 2255 motion to vacate, set aside, or correct sentence.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: June 28, 2019

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE